UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| OLUTOYIN A. ARAROMI, et al., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 10-1048 |
| v. | : | |
| | | OPINION |
| MIDDLE TOWNSHIP POLICE DEPARTMENT, et al.,: | | |
| Defendants. | : | |

This matter is before the Court on motions of Defendant Detective Robert Harkins [82] and Defendants Cape May County Regional SWAT Team, Cape May County, John Clemons, Joe Murphy, Luke Donahue, Roger Lillo, Brian Harkins, Mark Tomlin, Tom Hegarty, Pat Conte, and Ken Super [84] for summary judgment under Federal Rule of Civil Procedure 56.[1]  The Court has considered the submissions of the parties and has decided the motions pursuant to Federal Rule of Civil Procedure 78(b). For the reasons set forth below, both motions will be granted.

## **Jurisdiction**

This case is a civil action over which the district court has original jurisdiction based on a question "arising under the Constitution, laws, or treaties of the United States."  See 28 U.S.C. § 1331.  Plaintiff Olutoyin Araromi asserts a violation of her civil rights pursuant to 42 U.S.C. § 1983.  With respect to Plaintiff's state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

---

[1] It appears that the following Defendants remain in the case and are not part of the dispositive motions decided here: Diane Sorantino, individually and in her official capacity as Chief of Police of the Cape May County Police Department; United States Department of Justice Drug Enforcement Administration; and Michele Leonheart, individually and in her official capacity as a DEA Administrator.

**Background**

This matter arises out of a police investigation at the Esplanade Suites Hotel Resort in Wildwood, New Jersey.  On February 29, 2008, Plaintiff Olutoyin Araromi checked into the hotel and was assigned Room 206.  At approximately 2:00 a.m. on March 1, 2008, Plaintiff awoke when Defendants entered her hotel room pursuant to a no knock warrant for a drug related investigation.  Apparently, the Defendants had the wrong hotel room.  Nonetheless, Defendants allegedly "violently grabbed [Plaintiff] out of the bed, slammed her on the floor, handcuffed her, got on top of her, pointed guns at her head and face and yelled at her."  (Third Am. Compl., ¶ 6.)

In response to this incident, Plaintiff and her husband filed a twenty count Complaint in this Court.  The Complaint alleges "civil rights violations," "constitutional rights violations," conspiracy, assault and battery, intentional infliction of emotional distress, negligence, violations of the New Jersey Civil Rights Act, and loss of consortium.

Discovery in this matter has revealed the following details about the raid on Plaintiff's hotel room, which have not been disputed.  Beginning in November of 2007, Cape May County Prosecutor's Office Narcotics Task Force was actively engaged in a narcotics investigation involving the target Arthur "Skinny Man" Hoyle.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.  During the month of February 2008, Hoyle had distributed controlled dangerous substances in the City of Wildwood on numerous occasions.  See Ex. D to Behr Cert., Ex. B to Barrett Cert., Request for Tactical Assistance.  Detective Robert Harkins Jr., employed by the Cape May County Prosecutor's Office, testified that prior to February

2

21, 2008, "information was developed" that Hoyle was using both Room 206 and Room 305 of the Esplanade Motel in Wildwood, New Jersey to conduct drug related activities. See Ex. C to Behr Cert., Harkins Dep., 12:3-21.

Detective Omar Perez of the Cape May County Prosecutor's Office opened a search warrant, signed by a judge on February 21, 2008, to search the Esplanade Motel for Hoyle and evidence of his drug-related activities.  See Ex. B to Behr Cert., Ex. D to Davenport Cert., Search Warrant.  The search warrant authorized entry without first knocking and announcing identity and purpose, and specified that it had to be executed within ten days of February 21, 2008.  See Ex. B to Behr Cert., Ex. D to Davenport Cert., Search Warrant.  At the time the warrant was obtained, Perez was the lead case agent. See Ex. C to Behr Cert., Harkins Dep., 8:23-9:4.

On February 25, 2008, Harkins was conducting surveillance at the Esplanade Motel.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.; Ex. C to Behr Cert., Harkins Dep., 12:14-21.  While conducting the surveillance, he observed Hoyle arrive at the motel in a cab.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.  Harkins also observed a Wildwood City official conducting what appeared to be a routine fire inspection of the property.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.; Ex. C to Behr Cert., Harkins Dep., 12:18-13:6. Harkins talked to the official, Inspector Brian Neil, who informed Harkins that he had visited Rooms 205, 207, 303, and 305, which were occupied.[2]  See Ex. A to Behr Cert.,

---

[2] Motel management informed Neil that these four rooms were rented and occupied; three were registered to females and the fourth, Room 305, was registered to a male with an anticipated check-out date of February 28.  See Ex. A to Behr Cert., Ex. E to

Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.; Ex. C to

Behr Cert., Harkins Dep., 12:18-22:20-24:2.  Indeed, Neil reported that Room 305 was

occupied in that a large framed black male, unshaven, with various tattoos was in the

room.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det.

Robert Harkins Jr.; Ex. C to Behr Cert., Harkins Dep., 12:3-22:19.  Harkins obtained a

color photograph of Hoyle and Inspector Neil identified the individual he saw in Room

305 as Hoyle with facial hair.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5,

2008 Inv. Rpt. of Det. Robert Harkins Jr.; Ex. C to Behr Cert., Harkins Dep., 39:1-6.

Based on his experience, Harkins believed that the individual encountered by Neil in

Room 305 was Hoyle.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008

Inv. Rpt. of Det. Robert Harkins Jr.; Ex. C to Behr Cert., Harkins Dep., 12:3-28:24.  Neil

also reported that he had visited Room 206 which was "unoccupied,"[3] but also unkempt,

appearing recently used as of February 25, but "currently unoccupied."  See Ex. A to

Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.;

Ex. C to Behr Cert., Ex. C to Davenport Cert., Harkins Dep., 14:6-13; 19:4-22:10.

On February 26, 2008, Perez requested tactical assistance for the "February 27,

2008 – Approximately Unknown" execution of a warrant on Rooms 206 and 305 of the

Esplanade Motel.  See Ex. D to Behr Cert., Ex. B to Barrett Cert., Request for Tactical

Assistance.  The SWAT Team members that provide such tactical assistance are officers

---

Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.

[3] Harkins testified that it was common practice of drug dealers to use one room to sleep in and another room to keep drugs and/or money, so while Neil may have characterized Room 206 as "unoccupied," Harkins assumed this was a room that Hoyle was not using to sleep in but was using for drug related activities.  See Ex. C to Behr Cert., Ex. C to Davenport Cert., Harkins Dep., 20:24-21:3; 43:7-44:19; 67:9-68:4.

4

with different police departments and the sheriff's department who work under the umbrella of the Cape May County Prosecutor's Office.  See Ex. E to Behr Cert., Ex. D to Barrett Cert., Super Dep., 33:9-34:1; Ex. G t0 Behr Cert., Clemons Dep., 8:4-19.  The Prosecutor's Office utilized law enforcement officers from Narcotics Task Force, the SWAT team, and City of Wildwood Police Department.  See Ex. E to Behr Cert., Ex. D to Barrett Cert., Ex. B to Davenport Cert., Super Dep., 7:20-8:3; 33:9-34:1; Ex. G t0 Behr Cert., Clemons Dep., 8:4-19.

On February 29, 2008, Neil contacted Harkins and informed him that he had occasion to again contact the management of the Esplanade Motel in his capacity as Fire Inspector; Neil asked Harkins whether he needed any follow-up information.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.  In response to Harkins' request, Neil provided photographs of the entry areas to Rooms 206 and 305.  See Ex. C to Behr Cert., Harkins Dep., 29:6-25.  Neil also stated that the motel's registration cards listed both rooms as unoccupied.  See Ex. C to Behr Cert., Harkins Dep., 31:2-22.  When Neil questioned the manager about the man he had encountered in Room 305, she revealed that he had checked out of his room the day before, February 28.[4]  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.; Ex. C to Behr Cert., Harkins Dep., 32:6-18.  Finally, Neil informed Harkins that a maintenance man remarked that there were two black males staying in Room 305.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5,

---

[4] Harkins deemed this information not credible because Hoyle had been under surveillance from February 27 to February 29, and was determined to have traveled to Virginia to New York City to Millville, New Jersey to Connecticut and back to New York City, returning to the Esplanade Motel at approximately 11 p.m. on February 29.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins

2008 Inv. Rpt. of Det. Robert Harkins Jr.

The search operation was controlled by Lieutenant Ken Super of the Cape May County Prosecutor's Office who, at the time, was in charge of the Narcotics Division.  See Ex. G to Behr Cert., Clemons Dep., 10:6-12; 11:19-21; Ex. E to Behr Cert., Ex. D to Barrett Cert., Super Dep., 12:11-16.  Super oversaw the Hoyle investigation, see Ex. C to Behr Cert., Harkins Dep., 10:24-11:24; Ex. E to Behr Cert., Ex. D to Barrett Cert., Super Dep., 13:2-13, and had received information from Harkins that Hoyle was utilizing Room 206 of the motel.  See Ex. E to Behr Cert., Ex. D to Barrett Cert., Ex. B to Davenport Cert., Super Dep., 15:1-17:5; 22:21-23:13.  Super summoned the SWAT team to execute the warrants, see Ex. E to Behr Cert., Ex. D to Barrett Cert., Ex. B to Davenport Cert., Super Dep., 6:1-7:19; that is, the execution of the warrant by the SWAT Team to search Room 206 was based on Super's authorization, see Ex. E to Behr Cert., Ex. D to Barrett Cert., Ex. B to Davenport Cert., Super Dep., 8:4-15; 13:14-20, although Super was not a member of the SWAT Team, see Ex. E to Behr Cert., Ex. D to Barrett Cert., Ex. B to Davenport Cert., Super Dep., 7:3-19.

On February 29, 2008, Sergeant John Clemons of the Wildwood Police Department completed a warrant service plan as part of his duties as SWAT team commander.  See Ex. F to Behr Cert., Ex. C to Barrett Cert., Warrant Svc. Plan; Ex. G to Behr Cert., Clemons Dep., 5:13-20; Ex. E to Behr Cert., Ex. D to Barrett Cert., Ex. B to Davenport Cert., Super Dep., 12:17-13:1.  The deployment commander for the SWAT Team that entered Room 206 was Sergeant Joseph Murphy of the Wildwood Police Department.  See Ex. G to Behr Cert., Clemons Dep., 7:3-10; Ex. E to Behr Cert., Ex. D to

Jr.

Barrett Cert., Ex. B to Davenport Cert., Super Dep., 8:16-19.

Detective Landis and Harkins took up surveillance positions at approximately 10 p.m. on February 29, and remained in the surveillance positions while the search warrant was executed.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.; Ex. C to Behr Cert., Harkins Dep., 38:4-39:18.  At approximately 11:15 p.m., Harkins observed a Black male enter Room 305.  See Ex. C to Behr Cert., Harkins Dep., 39:1-6.

The search warrants for Rooms 206 and 305 were executed simultaneously at approximately 1:45 a.m. on Saturday, March 1, 2008, see Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr., with both rooms utilizing a six SWAT Team stack with the law enforcement personnel lined up in a row in executing the No Knock Warrant.  See Ex. G to Behr Cert., Clemons Dep., 17:9-25:24. See also Ex. F to Behr Cert., Ex. C to Barrett Cert., Warrant Service Plan.

For Room 206, Officer Roger Lillo of the Wildwood Crest Police Department was point, first in line.  See Ex. G to Behr Cert., Clemons Dep., 17:9-21.  As Lillo entered Room 206, he encountered a person lying on the bed; he testified that the person appeared to be a bald "Black male, large frame."  See Ex. I to Behr Cert., Ex. E to Barrett Cert., Ex. G to Davenport Cert., Lillo Dep., 11:13-12:3.  Lillo verbalized commands, "Police, Search Warrant, Show me your hands."  See Ex. I to Behr Cert., Ex. E to Barrett Cert., Ex. G to Davenport Cert., Lillo Dep., 11:13-20.  Lillo testified that it was his responsibility to cover the person in the bed with his weapon as two other officers moved the person from the bed to the floor and handcuffed her.  See Ex. I to Behr Cert., Ex. E to Barrett Cert., Ex. G to Davenport Cert., Lillo Dep., 13:18-22.  Other officers,

7

however, recalled Lillo involved in handcuffing Plaintiff.  See Ex. F to Barrett Cert.,
Donahue Dep., 25:1-18; Ex. I to Barrett Cert., Brian Harkins Dep., 23:1-17.  In any event,
Plaintiff was forced to the ground and handcuffed.  See Ex. I to Behr Cert., Ex. E to
Barrett Cert., Ex. G to Davenport Cert., Lillo Dep., 12:4-13:22.

Officer Tom Hegarty of the Cape May County Sheriff's Department was the
second person in the stack; he was in charge of using the battering ram to break down
the door.  See Ex. G to Behr Cert., Clemons Dep., 19:18-20:14; Ex. G to Barrett Cert.,
Hegarty Dep., 20:6-23.  In his capacity as the "breacher," Hegarty entered the room but
had no physical contact with Plaintiff and did not make any observations of her.  See Ex.
G to Barrett Cert., Hegarty Dep., 20:5-21:8.  To be clear, Lillo moved out of the way for
the ram to be used and Lillo then was the first officer to enter Room 206.  See Ex. G to
Behr Cert., Clemons Dep., 19:18-23:3.

Officer Luke Donahue of the Wildwood Crest Police Department was the second
to enter Room 206; he does not recall how plaintiff got from the bed to the floor, but
does recall assisting in handcuffing her and then helping her back onto the bed.  See Ex.
F to Barrett Cert., Donahue Dep., 22:4-25:18.

Officer Brian Harkins of the North Wildwood Police was the third man in the
room.  See Ex. I to Barrett Cert., Brian Harkins Dep., 20:14-21:1.  The officer has his
weapon drawn but not pointed at the Plaintiff.  See Ex. I to Barrett Cert., Brian Harkins
Dep., 22:6-15.  He testified that he did not touch Plaintiff in any capacity.  See Ex. I to
Barrett Cert., Brian Harkins Dep., 22:16-23:7.  As team leader for Room 206, Murphy
entered the room behind other officers.  See Ex. J to Barrett Cert., Murphy Dep., 14:1-
15:2.  It was his recollection that Brian Harkins may have "grabbed" Plaintiff and

8

"assisted" her to the floor, "gently," because at first she did not comply with the verbal commands.  See Ex. J to Barrett Cert., Murphy Dep., 18:1-20:11.

Officer Mark Tomlin of the Wildwood Crest Police was the fourth man that entered Room 206.  See Ex. K to Barrett Cert., Ex. L to Davenport Cert., Tomlin Dep., 10:8-15.  Tomlin entered the room, heard a woman's voice, watched two officers place the subject on the ground, and then saw her being brought back onto the bed in handcuffs.  See Ex. K to Barrett Cert., Ex. L to Davenport Cert., Tomlin Dep., 11:14-12:24.  When the room was cleared, Tomlin exited to an outside balcony; he had no physical contact with the Plaintiff.  See Ex. K to Barrett Cert., Ex. L to Davenport Cert., Tomlin Dep., 11:14-13:24.

Officer Patrick Conte of the Middle Township Police was a member of the SWAT Team, but did not enter Room 206.  See Ex. H to Barrett Cert., Ex. F to Davenport Cert., Conte Dep., 10:2-21.  He was assigned rear guard duty and as such stayed outside the room.  See Ex. H to Barrett Cert., Ex. F to Davenport Cert., Conte Dep., 10:22-11:10.

Clemons, the tactical commander, was part of the team that entered Room 305. After securing Room 305, Clemons heard someone yelling from the floor below.  See Ex. G to Behr Cert., Clemons Dep., 26:14-27:19.  Clemons and Super went to Room 206, encountered Plaintiff crying and upset, and determined Plaintiff was not part of their investigation.  See Ex. E to Behr Cert., Ex. D to Barrett Cert., Ex. B to Davenport Cert., Super Dep., 10:10-11:14.  Plaintiff's handcuffs were removed and Clemons and Super spoke to Plaintiff and inquired whether she needed medical attention; she declined and they arranged for transport to another motel.  See Ex. E to Behr Cert., Ex. D to Barrett Cert., Ex. B to Davenport Cert., Super Dep., 10:10-11:14.

9

Hoyle and another man were in Room 305 and arrested in possession of controlled dangerous substances.  See Ex. A to Behr Cert., Ex. E to Davenport Cert., Mar. 5, 2008 Inv. Rpt. of Det. Robert Harkins Jr.

## Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once

the moving party has met this burden, the nonmoving party must identify, by affidavits

or otherwise, specific facts showing that there is a genuine issue for trial.  Id.;

Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to

withstand a properly supported motion for summary judgment, the nonmoving party

must identify specific facts and affirmative evidence that contradict those offered by the

moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon

mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v.

Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting

Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.

Celotex, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot

be genuinely disputed by showing that "an adverse party cannot produce admissible

evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord

Fed. R. Civ. P. 56(c)(2).

 In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## Discussion

### 42 U.S.C. § 1983

Plaintiff's Constitutional claims are governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution.  See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). Any analysis of 42 U.S.C. § 1983 should begin with the language of the statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

See 42 U.S.C. § 1983.  As the above language makes clear, Section 1983 is a remedial statute designed to redress deprivations of rights secured by the Constitution and its subordinate federal laws.  See Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979).  By its own words, therefore, Section 1983 "does not . . . create substantive rights."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Baker, 443 U.S. at 145, n.3).

To state a cognizable claim under Section 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)).  Thus, a plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that plaintiff was deprived of her

rights by a person acting under the color of state law.  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 464 (3d Cir. 1989).

A similar analysis may be made regarding any claim under the New Jersey Civil Rights Act.  See Armstrong v. Sherman, No. 09-716 (AET), 2010 WL 2483911, *5 (D.N.J. Jun. 4, 2010) ("[T]he language of the New Jersey Civil Rights Act, like the language of 42 U.S.C. § 1983, appears to grant a cause of action only to those persons whose rights have been personally violated.").

## Municipal Liability

A municipality is not liable under 42 U.S.C. § 1983 on a respondeat superior theory.  Monell v. Dept. Soc. Servs. of New York, 436 U.S. 658, 691 (1978).  However, a government entity may be liable for its agent's actions upon a demonstration that a policy or custom of the municipality caused, or was a "moving force" behind, the alleged violation of Plaintiff's rights.  Kentucky v. Graham, 473 U.S. 159, 166 (1985) (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).  Thus, in order to prevail against the government entity, "[a] plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." Losch v. Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984).  Further, a plaintiff must show that the municipality acted with "deliberate indifference" to the known policy or custom.  Canton v. Harris, 489 U.S. 378, 388 (1989).  "A showing of simple or even heightened negligence will not suffice."  Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. at 397, 407 (1997).

Further, the United States Supreme Court has held that "neither a State nor its

officials acting under their official capacities are 'persons' under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  As such, an employee of the state named as a defendant in a civil rights action may be held liable only if that person has personal involvement in the alleged wrongs and is sued in their personal capacity.  See Hafer v. Melo, 502 U.S. 21, 31 (1991) ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983").

## Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001).  Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a

mistake of fact, or a mistake based on mixed questions of law and fact. Id. (internal quotation omitted). Properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier v. Katz, 533 U.S. 194, 202 (2001) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. Couden, 446 F.3d at 492 (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986). See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of the official was reasonable at the time it occurred.). Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant. See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

**Fourth Amendment**[5]

The Fourth Amendment provides:

---

[5] Plaintiff has not opposed the motion for summary judgment as to any alleged Fifth Amendment violation; similarly, Plaintiff has not opposed summary judgment on claims of violation of her substantive due process and/or equal protection rights.

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

Regarding a search, "[o]f prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search [the hotel room] for contraband.  A neutral and detached magistrate had found probable cause to believe that the law was being violated in that [hotel] and had authorized a substantial invasion of the privacy of the persons who resided there."  Michigan v. Summers, 452 U.S. 692, 701 (1981).  "[T]he execution of a warrant to search for narcotics is a kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.  The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."  Id. at 702-03.  The Supreme Court explicitly has held "that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  Id. at 705.  Further, '[i]nherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention."  Muehler v. Mena, 544 U.S. 93, 98-99 (2005).  As part of the search, "[p]olice may use firearms and handcuffs as part of a permissible detention when they reasonably believe it is necessary for their safety and protection."  United States v. Bennett, 329 F.3d 769, 774 (10th Cir. 2003).  See also Muehler, 544 U.S. at 99 (concluding that the 2– to 3–hour detention in handcuffs of an occupant of the address on a search warrant who was not suspected of any wrongdoing was reasonable because

16

such a "marginal intrusion" did not outweigh the government's continuing safety

interests); Torres v. United States, 200 F.3d 179 (3d Cir. 1999) (finding it lawful that, in

executing warrant to search for narcotics, agents entered premises with guns drawn and

pointed at the occupants).

A Fourth Amendment excessive force claim calls for an evaluation of whether

police officers' actions are objectively reasonable in light of the facts and circumstances

confronting him.  Graham v. Conner, 490 U.S. 386, 397 (1989).  While the question of

reasonableness is objective, the court may consider the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and

whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Id.  In a claim for excessive force, "the central question is 'whether force was applied in a

good faith effort to maintain or restore discipline, or maliciously and sadistically to

cause harm.'"  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Hudson v.

McMillian, 503 U.S. 1, 7 (1992)).

Furthermore, appropriate attention should be given "to the circumstances of the

police action, which are often 'tense, uncertain, and rapidly evolving.'"  Groman v.

Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995) (quoting Graham, 490 U.S. at

396).  See also Graham, 490 U.S. at 396 ("Not every push or shove, even if it may later

seem unnecessary," violates the constitution.).

**Analysis**

In this case, Plaintiff has failed to show that "each Government-official defendant,

through the official's own individual actions, has violated the Constitution."  See

Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  Plaintiff's opposition to the instant motion

17

for summary judgment makes no mention of the personal involvement of John Clemons, Joe Murphy, Luke Donahue, Roger Lillo, Brian Harkins, Mark Tomlin, Tom Hegarty, or Pat Conte that could be construed as violative of her constitutional rights. Although Plaintiff states that Murphy was the "head of the SWAT team" on the day at issue, and the Defendants have acknowledged the parts they played in executing the search warrant on Plaintiff's hotel room, Plaintiff points to no record evidence that the actions of these Defendants was not objectively reasonable in light of the facts and circumstances confronting them. The brief detention of Plaintiff by members of the SWAT team, even their use of handcuffs on Plaintiff and the fact that weapons were drawn during the execution of the search warrant, does not amount to a Fourth Amendment violation.

Plaintiff argues that Defendants Harkins and Super were directly and personally responsible for the raid on Room 206, which they should have known was in error because Hoyle had checked out four days prior. Notably, Plaintiff does not attack the validity of the arrest warrant. Rather, Plaintiff argues that the warrant was "stale," so entry into her hotel room was reckless. The warrant was executed within the time frame set forth on its face, so this argument is unavailing. See United States v. Bedford, 519 F.2d 650 (3d Cir. 1975) (finding that a warrant that authorized a search "forthwith" was validly executed eight days after issuance). As Harkins explained:

> [O]ur Title III investigation allowed us – like I said earlier, allowed us opportunity to track Mr. Hoyle's activities, and – just prior to this search warrant, and as a – as a goal, as a goal of a Title III investigation, the goal would be to catch Mr. Hoyle with narcotics product or proceeds; and based on our information at that time, we believed he was traveling from parts down south, Georgia, and we know that he traveled through New York City, and we know from the investigation that he was supplied

with cocaine and other narcotics through the Washington Heights section
of New York City.

So with his return to Wildwood on that evening, we had high
expectations that he would be in possession of a considerable amount of
narcotics to be sold on the streets of Wildwood, and that's really our main
mission, to seize that.

Ex. C to Behr Cert., Ex. C to Davenport Cert., Harkins Dep., 56:5-21.

As to the argument that because Plaintiff was in a hotel room, as opposed to a residential apartment, "common knowledge" indicates that rooms are turned over, so a ten-day window to execute the search was unreasonable, Plaintiff cites no law to establish such an theory and the Court has found none.  As such, Harkins and Super could not have violated a clearly established constitutional right, and they are entitled to qualified immunity.

As outlined above, a municipality is not liable under 42 U.S.C. § 1983 on a *respondeat superior* theory.  Monell v. Dept. Soc. Servs. of New York, 436 U.S. 658, 691 (1978).  Additionally, Plaintiff has failed to prove the existence of any official policies or customs that may have caused a constitutional violation in this case.  See, e.g., McTernan v. City of York, Pa., 564 F.3d 636 (3d Cir. 2009) ("[A plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was.").  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  Connick v. Thompson, –– U.S. ––, 131 S.Ct. 1359 (2011).  However, a plaintiff cannot seek to hold a municipality liable for damages where the officer has inflicted no constitutional harm.  Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 217 n.12 (3d Cir. 2009) (citing City of Los Angeles v.

19

Heller, 475 U.S. 796, 799 (1986)). Even if the officers' actions were unconstitutional, this single incident likely would not demonstrate a need for training so obvious as to give rise to a failure to train claim under § 1983. See Connick, 131 S.Ct. at 1360 (stating that "single-incident liability" applies only in "narrow range of circumstances" where "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations" (quotations and citations omitted)). As such, summary judgment is granted as to Cape May County.

A county prosecutor's office is not a separate entity that can be sued under §1983, Briggs v. Moore, 251 Fed. Appx. 77, 79 (3d Cir. 2007), and a sheriff's office cannot be sued in conjunction with the county it serves, because it is not an entity separate from the county, but rather is merely an arm of the county. McLaughlin v. County of Gloucester, 2008 WL 700125, *2 (D.N.J. 2008) (citations omitted); see also Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997) (holding police department and municipality same for § 1983); Adams v. City of Camden, 461 F. Supp. 2d 263, 266 (D.N.J. 2006) (holding police departments cannot be sued in conjunction with municipalities because police departments are administrative arms of municipalities, not separate entities); N.J. Stat. Ann. § 40A:14-118 (municipal police department is "an executive and enforcement function of municipal government"). It follows that the Cape May County Regional SWAT Team is not amenable to suit on its own, and summary judgment will be granted as to that entity.

A plaintiff must establish the following for such a cause of action 42 U.S.C. § 1985(3): (1) A conspiracy; (2) for the purpose of depriving, either directly or indirectly,

any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) act in furtherance of the conspiracy; and (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States. Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (quoting United Brotherhood of Carpenters & Jointers v. Scott, 463 U.S. 825, 828-29 (1983)). "It is well established that § 1985(3) does not itself create any substantive rights; rather, it serves only as a vehicle for vindicating federal rights and privileges which have been defined elsewhere." Brown v. Philip Morris Inc., 250 F.3d 789, 805 (3d Cir. 2001). A "meeting of the minds" is required for a civil rights conspiracy cause of action. Starzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008). There is no evidence in the record of any "combination, agreement, or understanding among all or between any of the defendants to plot, plan or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right." Fioriglio v. City of Atlantic City, 996 F. Supp. 379, 385 (D.N.J. 1998). Nor is there any evidence of an agreement among the Defendants to employ excessive force on Plaintiff or target her because of her race. Summary judgment will be granted as to any claim brought pursuant to 42 U.S.C. § 1985.

42 U.S.C. § 1986 does not create an independent cause of action; section 1986 creates a cause of action against those "having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed[.]" 42 U.S.C. § 1986. Without a viable Section 1985 claim, a Section 1986 claim cannot survive. See

21

Lee-Patterson v. N.J. Transit Bus Operations, Inc., 957 F. Supp. 1391, 1403 (D.N.J. 1997) (citing Black v. Bayer, 672 F.2d 309, 312-13, n.4 (1982)).  Moreover, the statute of limitations for 42 U.S.C. § 1986 claims is one year after the claim has accrued.  See Cito v. Bridgewater Township Pol. Dept., 892 F.2d 23, 25 (3d Cir. 1989).  Because Plaintiff's § 1985 claim is without merit and because plaintiff failed to bring his claim within one year of the alleged incident, summary judgment will be ranted on her § 1986 claim.

Under 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction" over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  Because the Court has dismissed all of Plaintiff's federal constitutional claims, the Court will decline to exercise supplemental jurisdiction over Plaintiff's assault and battery, intentional infliction of emotional distress, negligence, New Jersey Civil Rights Act, and lack of consortium claims.

## Conclusion

For the reasons set forth here, summary judgment is granted on the entirety of Plaintiff's Complaint.  An appropriate Order will be filed.


Dated: March 31, 2014                          /s/ Joseph H. Rodriguez
                                              JOSEPH H. RODRIGUEZ
                                                    U.S.D.J.

22